1    IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT
3            NORTHERN DIVISION
4

5    UNITED STATES OF AMERICA,    )
6                                 )
7             Plaintiff,          )
8                                 )  No. 3:08-CR-142
9        vs.                      )  Knoxville, Tennessee
10                                )  July 16, 2009
11   DAVID C. KERNELL,            )  9:30 a.m.
12                                )
13            Defendant.          )
14

15

16            TRANSCRIPT OF PROCEEDINGS
17   BEFORE THE HONORABLE C. CLIFFORD SHIRLEY, JR.
18           UNITED STATES MAGISTRATE JUDGE
19

20

21

22   APPEARANCES:
23   For the Plaintiff:      GREGORY WEDDLE, ESQ.
24                           JOSH GOLDFOOT, ESQ.
25                           MARK KROTOSKI, ESQ.
26   For the Defendant       WADE V. DAVIES, ESQ.
27                           ANNE PASSINO, ESQ.
28

29

30

31

32   _____
33            LYNDA CLARK, CCR, CRR, RMR
34         MILLER & MILLER COURT REPORTERS
35       12804 Union Road, Knoxville, Tennessee
36      Phone: (865) 675-1471 / FAX: (865) 675-6398

1                                    INDEX

2

3                                   EXHIBIT

4        NO.    DESCRIPTION                              PAGE

5        1      Application & Affidavit to the

6               Search Warrant and Search Warrant        19

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24       (Note:  Unless provided to the court reporter, all

25       spellings are to the best phonetic approximation.)

26

27

1          This cause came on for hearing on the 16th

2    day of July, 2009, in the United States District Court

3    for the Eastern District of Tennessee, Northern

4    Division, before the Honorable C. Clifford Shirley,

5    presiding.

6          The Court having been duly opened, the

7    following proceedings were had, to-wit:

8          THE COURTROOM DEPUTY:  All rise.

9          The United States District Court for the

10   Eastern District of Tennessee is now open pursuant to

11   adjournment with the Honorable C. Clifford Shirley,

12   Jr., presiding.

13          Please come to order and be seated.

14          Case number 3:08-cr-142, United States of

15   America versus David C. Kernell.

16          Greg Weddle, Mark Krotoski, and Josh

17   Goldfoot are here on behalf of the government.

18          Is the government present and ready to

19   proceed?

20          MR. WEDDLE:  Ready to proceed, Your Honor.

21          THE COURT:  Wade Davies and Anne Passino

22   are here on behalf of the defendant.

23          Is the defendant present and ready to

24   proceed?

25          MR. DAVIES:  Present and ready, Your Honor.

1          THE COURT:  All right.  We're here on the

2     Motion to Suppress and there are some ancillary

3     motions and filings.

4          I think I'd rather start just with the

5     Motion to Suppress and then work our way through and

6     decide if there's a need for evidentiary testimony,

7     and if so, what it's going to look like and what

8     limitations it will have on it.

9          Does that sound okay to you, Mr. Davies?

10         MR. DAVIES:  Well, what I would suggest,

11    Your Honor, is that we actually argue the merits of

12    the Motion to Suppress after we have the evidentiary

13    portion of the hearing, because I think the argument

14    is going to be key to the facts that come out during

15    the hearing itself.

16         And what I had -- what I would envision is

17    that we would put on Agent Fall (phonetic) and

18    perhaps Agent Fisher, and then Ms. Passino would

19    argue the merits of the motion based on the facts.

20         THE COURT:  Well, there's two parts to your

21    motion, right?

22         MR. DAVIES:  Yes.

23         THE COURT:  One is the lack of probable

24    cause in issuing the search warrant to begin with.

25    No evidentiary hearing is required on that one,

1     right?

2           MR. DAVIES:  That's right, except to the

3     extent if there is -- there is an issue about whether

4     there is probable cause or a necessity to seize the

5     entire computer.  And I think that it is a potential

6     that some of the evidence would at least affect the

7     Court's ruling on that particular issue.  But

8     generally the issues are probable cause and then

9     execution.

10          However, I think they're very much

11    interrelated, because our position essentially is

12    that this warrant actually does place limits on the

13    government.  And only if it is read in a certain way,

14    which would allow them to do the almost limitless

15    search that appears to have been done, would we

16    really get into the fact that in order to do that you

17    would have to read it almost in a way that would make

18    it a general warrant.

19          So the probable cause and execution

20    arguments are very much intertwined I think.

21          THE COURT:  They may be intertwined but I'm

22    still not following you as to how do you think you're

23    entitled to have an evidentiary hearing on the issue

24    of the issuance of the search warrant as opposed to

25    the execution of the search warrant.

1          MR. DAVIES:  The evidentiary hearing is

2     almost exclusively on the execution of the warrant.

3          THE COURT:  You still continue to hedge

4     with the "almost".  I'm trying to figure out under

5     what scenario you think you're entitled to any

6     evidentiary hearing with regard to the first element.

7          MR. DAVIES:  Only on the issue of whether

8     there is probable cause demonstrated in the warrant

9     for the government to need to seize the entire

10    computer rather than image it on site.

11          And I think that some of the evidence that

12    would be developed at the evidentiary hearing would

13    assist the Court in making that determination.

14          THE COURT:  So are you saying that if I

15    hear testimony on that, even if the affidavit and

16    application was insufficient, I can now make it

17    sufficient because I have testimony that bolsters it?

18          MR. DAVIES:  I think my argument would be

19    the opposite which will be --

20          THE COURT:  Well, that's what you're hoping

21    the testimony will be.  I understand that --

22          MR. DAVIES:  That's right.

23          THE COURT:  -- but in reverse if I agree

24    with you that the warrant was insufficient but the

25    testimony bolstered it, would it then be your

1    position that I could rely on it to bootstrap it

2    back?

3         MR. DAVIES:  I don't think that would be

4    the case.  And I think -- Normally I agree with the

5    Court that a probable cause determination is based on

6    the four corners of the affidavit itself.

7         In this case I think there is some -- not

8    vagueness but there is some question about whether

9    the affidavit itself demonstrates a reason why the

10   entire computer would need to be seized rather than

11   imaged, and I think that the facts brought out about

12   what is in fact capable could at least provide

13   background and guidance to the Court on that issue.

14        But going back to the main issue, I agree

15   that an evidentiary hearing is primarily warranted by

16   the second issue, which is the scope of the execution

17   of the warrant.

18        But really, Your Honor, the reason they're

19   so closely intertwined is that by and large we only

20   get to the probable cause issue and the sufficiency

21   of the warrant if we get to a point where this

22   warrant is read so broadly that it could authorize

23   the almost limitless search that was carried out.

24        So that's why I really think it makes more

25   sense to argue both of those issues at the same time,

1    because they're going to be -- we're going to be

2    going back and forth.  I think the Court will

3    probably have questions that are relevant to both

4    issues.

5         So that's why it makes sense to me to put

6    on the proof first and then argue it.

7         THE COURT:  Okay.  What do you say,

8    Mr. Weddle?

9         MR. WEDDLE:  Well, as the Court might

10   suspect, we disagree.  There again is no reason to

11   have any evidence on the issue of whether there's

12   probable cause in the application for the search

13   warrant.

14        The search warrant specifically authorized

15   the agents to take the Acer laptop computer.  The

16   affidavit establishes that it is an instrumentality

17   of the offense.  Whether it could be imaged on site

18   is of really no consequence to this warrant, and

19   there's no need to take any evidence on that.

20        It's an instrumentality of crime.  The

21   warrant -- The affidavit either establishes or

22   doesn't establish that, and the warrant authorized

23   the agents to take that computer.

24        I think that we should -- Again, Your

25   Honor, without getting into too much argument here I

1     think what Mr. Davies wants to do is to try to put up

2     some evidence to see if he can make something.  I

3     think we should argue the legal issues in this Motion

4     to Suppress and then take up what factual issues are

5     in dispute with respect to the execution of the

6     warrant.

7          Those two things -- as much as Mr. Davies

8     says are interrelated, they're really not.  They're

9     separate issues.  They ought to be dealt with

10    separately.  And that's how we would prefer to

11    proceed, Your Honor.

12         THE COURT:  All right.  I think I tend to

13    agree with Mr. Weddle or else he tends to agree with

14    me with regard to the scope of the hearing.

15         I will say this:  If it turns out that I

16    think in the argument on probable cause that there is

17    some need for some evidentiary proof, we'll have the

18    opportunity to get that later in the second part.  If

19    I allow it with regard to the execution, I can simply

20    provide that that can be inquired into and set the

21    parameters on that.

22         But at this point I would like to hear

23    first, whether it's you or Ms. Passino, on the

24    probable cause argument.

25         MS. PASSINO:  Good morning, Your Honor.

1                    THE COURT:  Good morning.

2                    MS. PASSINO:  I'm not sure I'm going to be

3        able to separate these two issues.  I'll do my best.

4                    The Motion to Suppress -- That's

5        Document 20, Government's Response 22, and our reply

6        Document 27.  The original Motion to Suppress is

7        styled Motion to Suppress evidence for which no

8        probable cause existed having been obtained either

9        outside the scope of authority granted by the warrant

10       or under the authority of the general search warrant.

11                   The issue that we would hope to show by the

12       proof is that the search warrant here issued based on

13       probable cause to seize limited files from

14       Mr. Kernell's computer but that the computer has been

15       examined as if there were no limitations.

16                   Because this is the overarching issue there

17       are really four considerations that have to be looked

18       at before you get to whether or not there was

19       probable cause; questions like are there any

20       limitations on a computer inspection, even one

21       authorized by a search warrant?  What does it mean to

22       execute a search warrant?

23                   Here the search warrant issued

24       September 20th at 11:17 p.m. commanding the agents to

25       search on or before September 29th.  The return

1    indicates that it was executed shortly after it was

2    issued; that is, September 20th at 11:55.

3         When looking at the computer search warrant

4    and probable cause issues, there is sort of an

5    interesting twist, which is searches and seizures are

6    -- there are multiple searches even if there's only

7    one seizure.  And we would argue that there are

8    multiple seizures.

9         So based on Korton (phonetic) versus

10   California's characterization of what constitutes a

11   search and what constitutes a seizure, even though

12   the laptop itself was physically seized the same

13   night the warrant issued, the searches, based on the

14   expert reports provided, were multiple and prolonged.

15        The next issue --

16        THE COURT:  What do you consider a multiple

17   search?  Opening each file?

18        MS. PASSINO:  I wouldn't even have to go

19   that far.  Different programs were run on the

20   computer by different government agents in different

21   cities at different times.

22        THE COURT:  If someone were to go into a

23   business and conduct a search pursuant to a search

24   warrant, open a file drawer in a filing cabinet,

25   would each file they look in in your mind be a

1    separate search?

2              MS. PASSINO:  No.

3              THE COURT:  Then why would looking in a

4    file on a computer that contains the same information

5    be a multiple search?

6              MS. PASSINO:  Well, another difference

7    between looking in a filing cabinet and looking in a

8    computer file is that there isn't a direct sensory

9    correlation between looking at a piece of paper -- A

10   computer search depends on running a program in order

11   to get access to what that data means and looks like.

12             So even if say multiple -- opening multiple

13   files on one computer did not constitute a search,

14   when did that window of time need to -- when did

15   those single searches of multiple files -- what time

16   period did those need to occur in to be reasonable

17   under the Fourth Amendment?

18             THE COURT:  So now it's not the scope, what

19   they can look in, it's when they can look in it?

20             MS. PASSINO:  It's both.  It's what they

21   looked at, how much, how often, and where.

22             THE COURT:  All right.

23             MS. PASSINO:  Which sort of goes to what

24   does Rule 41 mean in terms of a computer search.  If

25   the statutes and rules meant to facilitate judicial

1    oversight aren't as applicable under -- when you're

2    looking at a forensic computer search, what

3    limitations are there?  And as set out in our motion

4    the conclusion required by the law is that there must

5    be limitations.

6          In Illinois versus Cabalis (phonetic) the

7    United States Supreme Court, although they are

8    upholding the search, reminded that even a search

9    that's lawful at its inception can violate the Fourth

10   Amendment if its execution unreasonably infringes

11   interests protected by the Constitution.

12         THE COURT:  I'm not meaning to cut you off,

13   but I understand that part of the argument.  That was

14   what I was anticipating would be second, the limits,

15   if any, on the execution of the search warrant and

16   whether that was exceeded or not.

17         MS. PASSINO:  And those arguments turn on

18   what is the meaning of -- what is the significance of

19   the repeated and prolonged searches?  If those were

20   authorized by the search warrant, then it's a general

21   warrant, and that does get to the probable cause.

22         But those same repeated and prolonged

23   searches -- if those aren't authorized by the search

24   warrant, then that's where Your Honor is correct that

25   the focus is on did that exceed the scope of

1    authority granted under the search warrant.

2          One of the cases cited -- I believe it was

3    cited for the first time in our reply -- was United

4    States versus Corado (phonetic) in which officers

5    sought and obtained a search warrant for a marijuana

6    grow house.  They got there.  They didn't see anyone,

7    so they decided to even wait out the five-day period

8    to see if anyone showed up during that time.

9          That evidence was suppressed because those

10   officers -- once their authority to be there expired,

11   they remained in the house for more time than was

12   reasonably necessary to execute the scope of a search

13   warrant.

14         Perhaps more on point is the case decided

15   by the 11th Circuit just this April, which is United

16   States versus Mitchell.  That defendant was targeted

17   as potentially having child pornography on his

18   computer.

19         The issue before the Court in terms of

20   suppression wasn't whether or not the computer was

21   lawfully seized.  It wasn't seized pursuant to a

22   search warrant, but it was seized, taken off site.

23         The agent who was going to perform the

24   forensic search ended up going on a training session.

25   He returned 21 days later, got his search warrant at

1    that point.  And the issue was whether that 21-day

2    delay was reasonable.

3         The Court held that it wasn't reasonable.

4    And it wasn't reasonable because the computer wasn't

5    lawfully seized and it wasn't reasonable because

6    the -- even though the computer search could not have

7    taken place and been completed within that same

8    period of time.

9         The recognition in Mitchell is sort of the

10   sentiment expressed in Kyler (phonetic), which is

11   there are limits on technologies.

12        So the computer forensic search seeks

13   access to the equivalent of thousands and tens of

14   thousands of pages of documents doesn't make it --

15   doesn't make -- There is no computer exception to the

16   Fourth Amendment, so you have to -- one looks at the

17   traditional notions of privacy.

18        Computer data has been recognized as an

19   interest in which individuals have a privacy interest

20   and that means that there are limitations, and when a

21   reasonableness consideration is performed on the

22   search, that that factors in.

23        I was trying to think of a good analogy for

24   a computer search.  I mean it is unique and pretty

25   new technology.  The Supreme Court really hasn't

1    looked at it.  And one of things that makes sense to

2    me at least is looking back at Ibarra.  I mean it's a

3    pretty classic case.

4         The officers had a search warrant to go in

5    and look for evidence of drugs.  They also had

6    probable cause to look for a bartender.  But because

7    the agents patted down the patrons that made the

8    search in violation of the Fourth Amendment because

9    the search warrant hadn't alleged that there was --

10   that that place was frequented by people who dealt or

11   bought or sold drugs.

12        So the search warrant in this case -- And

13   this does get back to probable cause, and I apologize

14   for bouncing back and forth.  But the search warrant

15   in this case made no allegations that this was other

16   than a one-time thing.

17        That is, the case cited by the government

18   in their response was I think United States versus

19   Tillotson, which more eloquently says it was -- they

20   compare the facts in that case to perhaps what would

21   have -- they would have reached a different outcome

22   based on an isolated circumstance of brief duration.

23        So like in Ibarra --

24        THE COURT:  Is that in that case?  Does

25   that say that?

1      MS. PASSINO:  It's a contrast to what they

2  saw.

3      THE COURT:  Okay.

4      MS. PASSINO:  But the search warrant here,

5  like the search warrant in Ibarra, didn't allege a

6  systemic -- or, you know, that the place was imbued

7  with criminal content or activity.  And so the

8  files -- you know, propinquity does not equal

9  probable cause.  Just because you're -- you are in a

10  location, just because --

11     THE COURT:  Are you saying there was no

12  probable cause to search his computer at all?

13     MS. PASSINO:  No.  That's not what I'm

14  saying.

15     THE COURT:  All right.  Then what are you

16  saying?

17     MS. PASSINO:  I'm saying that there was no

18  probable cause to search his computer in the way that

19  it was searched.

20     All the files on a computer are not

21  co-equal.  There are files created at different time

22  periods.  There are files that are more or less like

23  what the search warrant granted them authority to

24  seize.  And that's mostly based on the limiting

25  characteristics of paragraph 1's attachment B talking

1     about the gov.palin and Yahoo and rubico.

2                THE COURT:  Do you have a copy of the

3     search warrant?

4                MS. PASSINO:  I do.

5                THE COURT:  Has it been made an exhibit to

6     any of the filings?  It's usually of benefit before

7     challenging a search warrant.

8                MR. DAVIES:  I think that it has, but we

9     need to make sure that it has.

10               THE COURT:  I'm not sure.

11               MS. PASSINO:  I'm not sure.

12               THE COURT:  Do you have a copy at hand?

13               MS. PASSINO:  I have a copy that's

14    scribbled all over.

15               THE COURT:  Do you have an unscribbled-on

16    copy?

17               MR. DAVIES:  I do.  It only contains your

18    scribbling, Your Honor.

19               THE COURT:  My scribbling will be

20    considered.

21               And so that we understand, so that it's

22    clear, what I'm looking at and my demarcations -- and

23    you tell me if I'm wrong -- is that your argument on

24    probable cause -- because I issued the search

25    warrant -- is that I erred.

1          The second argument, the execution, is,

2     well, even if you didn't err, Judge, and you issued a

3     good search warrant, the agents erred because they

4     went way too far.

5          Now, am I misstating that?  Is not the

6     difference in the two arguments?

7          MS. PASSINO:  I would restate that to say

8     that the issue with both arguments turns on the face

9     of the warrant.

10          The warrant -- Our position is that the

11     warrant does contain limiting information.  If it is

12     read -- and it appears to have been read by the

13     executing agents not to include those limitations,

14     then it is in our warrant.  If it does include those

15     limitations which are on the face of warrant, then

16     the execution exceeded the scope of the authority

17     granted under the warrant.

18          MR. DAVIES:  Your Honor, if I may approach,

19     I have a copy.  I would make it Exhibit 1 to this

20     hearing, which is the application and affidavit to

21     the search warrant, the warrant itself, and the

22     attachments, and the return.

23          (Exhibit 1 was admitted into evidence.)

24          THE COURT:  Okay.  Go ahead.

25          MS. PASSINO:  The second half of the

1      argument, which is the general search warrant

2      argument, is really based on particularity, which

3      is -- The purpose of requiring the places and items

4      to be searched and seized to be described with

5      sufficient particularity is to limit officers'

6      discretion when executing a warrant.

7            You know, the primary purpose of that is to

8      prevent wide-ranging exploratory searches.  That is,

9      you can't say someone is involved in a crime,

10     therefore, everything associated with them is fair

11     game to be searched.  There must be carefully

12     tailored and particularly described items to be

13     searched.

14           The cases cited in the motion were United

15     States versus Abboud (phonetic) -- that's a Sixth

16     Circuit 2006 decision -- and United States versus

17     Ford, another Sixth Circuit decision; that one from

18     1999.  These cases -- I think anyway aren't helpful

19     looking at what -- how could this warrant have been

20     executed?  What limitations were there based on the

21     probable cause as set forth in the affidavit.

22           In Abboud the warrant was considered

23     overbroad because it authorized the search for

24     records from '96 to 2002, but there was probable

25     cause for just a three-month period in '99.

1          Here, according to those -- to the

2     affidavit, this was -- what investigators were

3     interested in was something that took place over a

4     few days in September of 2008.

5          To be sure, the degree of specificity

6     depends on what information is available to police at

7     the time they seek the search warrant, though there

8     is a correlation between the amount of particularity

9     and probable cause itself.  The more particularly

10    something is described the more likely that there is

11    probable cause.

12         The information in the affidavit did not

13    present probable cause to believe that this was

14    anything other than an isolated circumstance of brief

15    duration.  This was not like the facts in Tillotson.

16    This was not -- This was different.

17         So given the speed at which technology

18    changes, the government's reliance on Guest versus

19    Leis, the Sixth Circuit opinion from 2001, to say

20    that seizing an entire computer is consistent with

21    the Fourth Amendment is relevant.  But that case was

22    decided eight years ago.  Technology and what is

23    reasonable now has changed.

24         And I think that's what -- why we cited to

25    the Department of Justice's manual on searching and

1    seizing computers, which suggested that perhaps

2    imaging a computer on site is more appropriate or

3    more reasonable than looking at that on a

4    case-by-case basis.

5        The allegations in the search warrant did

6    not support seizing the entire computer so --

7        THE COURT:  The warrant what?  The warrant

8    did not authorize seizing the Acer computer?

9        MS. PASSINO:  The warrant did.  The

10   allegations in support do not.

11       I guess this gets back to so what are we

12   asking for or what should have happened?  And I think

13   depending on what the proof is -- the proof that some

14   of the things that could have been done include, as

15   mentioned in the motion, some building up of probable

16   cause; that is, checking back with the Court for a

17   second search warrant or for a limiting protocol,

18   limiting the number of searches, limiting the

19   duration of searches, limiting the method of

20   searches, creating filters to exclude parts of the

21   hard drive for which there was no probable cause.

22       We don't know exactly what's been done.  We

23   have the results of the searches, but we don't know

24   the processes by which those results were arrived at.

25       THE COURT:  How would that have occurred?

1    I'm having trouble figuring out how that would occur.

2        MS. PASSINO:  Well, United States versus

3    Mitchell, the case I talked about earlier where the

4    computer was seized and then the second search

5    warrant was sought, is a decent model, which is to

6    say even if the computer had been seized pursuant to

7    the search warrant a second search warrant could have

8    been sought to say here are the things that we now

9    know or the areas on the hard drive or the protocols

10   we'd like to run in order to look for what we believe

11   is there rather than looking everywhere for what they

12   did have probable cause to look for.

13       THE COURT:  And how would they do that?

14   For example, I mean I understand that if there was a

15   file that was entitled "Hacking File", that they

16   might -- you might say they're limited to looking in

17   that file.  What if they had a file that said,

18   "Government Class 101?"  You would argue, well,

19   that's obviously his schoolwork, and they shouldn't

20   be going through that file.  But what if that's where

21   he chose to put these files?  How would they ever

22   find it?

23       MS. PASSINO:  Many courts have pointed out

24   that a person engaged in criminal activity isn't

25   likely to say, "Here is my crime file," that -- And

1   the affidavit suggested there are ways to hide, booby

2   trap, to mislead investigators.  So it's -- the issue

3   isn't whether or not they had probable cause to

4   search in a mislabeled or potentially mislabeled file

5   but what they had probable cause to search for.

6           THE COURT:  So now it's not where they

7   searched but what they were searching for?  I thought

8   the argument was that they wholesale went through all

9   the files, and that was the problem.  It was the

10  where that was the problem.  What I hear you say now

11  is it's not where they searched but what they

12  searched for.

13          MS. PASSINO:  Respectfully, there are

14  multiple problems with what occurred on the computer

15  so --

16          THE COURT:  Well, how would you search for

17  something that was intentionally put in a misnamed

18  file?

19          MS. PASSINO:  If the question is where

20  then --

21          THE COURT:  Uh-huh.

22          MS. PASSINO:  And my knowledge of computers

23  is pretty rudimentary, so I'm not going to pretend to

24  know exactly the ways in which Encase (phonetic) can

25  be programmed to limit, but my understanding is that

1          you can limit the where on the hard drive to times in

2          which files were created, so that the where can be

3          limited and the what can be limited to types of

4          files.

5                  Did the warrant authorize you to look for

6          personal information?  Once you find that personal

7          information is it like with opening a filing cabinet?

8          Do you then move on to the next file once you

9          discover that it's not relevant, or is that

10         incorporated into the search?

11                 THE COURT:  But at the first instance when

12         I'm issuing the search warrant how do I limit that?

13                 MS. PASSINO:  Paragraph one --

14                 THE COURT:  Like, for instance, let's say

15         I'm issuing a search warrant for someone to go into a

16         warehouse and go through the filing cabinets looking

17         for some very specific documents of illegal activity.

18         Assuming they're like drug transaction records,

19         they're not likely to be in a file marked "Drug

20         Transaction Records."  So they're going to be in some

21         other kind of file.  How is it that I limit which

22         drawers they can look in?

23                 MS. PASSINO:  Well, maybe one of the ways

24         is to limit the number of times they can look in that

25         drawer.  With Q word searches running on a program

1    the -- While a file may not be labeled "Drug

2    Transactions", there are data points that correlate

3    to the probable cause requirement I think.

4          And I'm sure that the government and its

5    experts know more than I do, but one of the

6    suggestions that I've seen, at least in the academic

7    literature, is that the search protocol can be

8    limited to items for which -- and similar items for

9    which there is probable cause.

10         How is one to determine whether a file is

11   or isn't similar to a term in the warrant?  That

12   level of discretion is something that is contrary to

13   the Fourth Amendment even if they could look in that

14   file to begin with.

15         THE COURT:  But that is in essence your

16   argument, that there needs to be a search protocol

17   placed in a search warrant at the inception?

18         MS. PASSINO:  Well, that is one suggestion.

19   We're here today and we're seeking to put on proof to

20   show that even on the tail end you can see whether or

21   not something was reasonable so --

22         THE COURT:  But I mean isn't that your

23   argument?  There needs to be a search protocol?

24         MS. PASSINO:  That there needs to be some

25   kind of limitations and the character of those

1          limitations is up to the Court.

2                THE COURT:  Is there any Supreme Court or

3          Sixth Circuit precedent that there needs to be a

4          search protocol in any search warrant?

5                MS. PASSINO:  In any search warrant?  That

6          goes I would say back to the Corado case, the Cabalis

7          case, that a valid warrant or a valid search,

8          although the methods and particular means of

9          searching aren't required to be specified, if the

10         manner of searching is unreasonable and could have

11         been made reasonable, that -- It's a separate issue,

12         but I think it's related enough to show that the

13         manner isn't wholly without -- the manner in which

14         the search warrant is executed isn't wholly without

15         limitation.

16               THE COURT:  I may be reading that wrong,

17         but it seems to me that you're placing the burden on

18         all Magistrate Judges that if they can envision how

19         an agent might misuse a warrant that they have some

20         sort of an obligation now to add in language to

21         prevent that.

22               In other words, if I say you can only go

23         search such and such a room in a house, if I envision

24         that they might go to another room, I now have to put

25         limiting language about that specific other room.

1          In other words, you're saying I should

2     envision that they're not going to follow my orders

3     and put limiting language beyond that.

4          MS. PASSINO:  Well, I think what this

5     recognizes -- what our position argues is that

6     computers -- the analogy of traditional Fourth

7     Amendment concepts applies and transfers but that it

8     is a unique circumstance because there is a search

9     for that computer.  That computer is seized and that

10    computer is researched.

11         So the limitations that a Magistrate Judge

12    places on the search isn't required to exclude all

13    other locations for the seizure.  What the

14    protocol -- And I'm not sure that that's the right

15    word.  But what some sort of judicial oversight on

16    the subsequent searches of the computers should do if

17    it's not in the original warrant -- and there may not

18    be enough information to do that on the front end --

19    but at some point there should -- an order to be

20    reasonable and comply with the Fourth Amendment

21    instead of waiting until the search has been

22    completed and privacy interests have been invaded

23    that there are ways in which limitations can be

24    acknowledged.  And it doesn't assume, I don't think,

25    that --

1      THE COURT:  Well, let me ask you this --

2      And I understand the difference in computers, and I

3      understand there's this attempt to take standard

4      Fourth Amendment search of places and extrapolate it

5      into computers.  We have to do that.

6      My question is if I took your argument and

7      applied it to computers, then would people try to

8      extrapolate back?  In other words, if I have to now

9      have judicial review over the method and manner in

10     which a search is conducted on the front end, would

11     that be true about going into a house and issuing a

12     search warrant to search for drugs?

13     Would I say, well, now we need to sit down

14     and decide how we're going to do that?  Do I become

15     part of the team that goes in and part of the

16     strategy of how it's going to be accomplished, which

17     door they're going to go in, and how they're going to

18     do that?

19     I mean wouldn't that be a reasonable

20     argument if I accepted your argument that, Judge, you

21     should have set up a methodology and had judicial

22     review of this search, so you should obviously have a

23     judicial review of these other searches?  Where does

24     it end?  I mean that's part of my problem, you

25     understand.

1          MS. PASSINO:  I do understand.

2          THE COURT:  And I'm troubled -- Let me ask

3    you about this.  Your brief says the warrant did not

4    authorize -- my search warrant did not authorize the

5    wholesale examination of all files on Mr. Kernell's

6    computer, but you seem to be arguing what's wrong

7    with your warrant is you did authorize that.  But

8    your argument is I didn't.  Now, help me with that.

9          MS. PASSINO:  If you can direct me to

10   the --

11         THE COURT:  Page 6 --

12         MS. PASSINO:  Page 6.

13         THE COURT:  -- bottom last full line and up

14   to the first part of page 7 on Document 20.

15         MS. PASSINO:  My understanding of that is

16   that when the motion says the warrant did not

17   authorize the wholesale examination, that assumes

18   that there was a wholesale examination.  That assumes

19   that -- I think what we've been talking about is

20   there were limitations within the search warrant.

21         The warrant did not authorize the wholesale

22   examination, and if that's what occurred, as the next

23   sentence says, to the extent that the government has

24   subsequently examined the computer and all its

25   contents the government has exceeded the scope of the

1    warrant.

2              I think implied in that is that there were

3    limitations.  It did not authorize the wholesale

4    examination but a wholesale examination --

5              THE COURT:  Well, then what's wrong with

6    the warrant?

7              MS. PASSINO:  It depends on how the warrant

8    is read.  I think the argument --

9              THE COURT:  No, it depends on how the

10   warrant is executed, doesn't it?

11             MS. PASSINO:  How the warrant was read by

12   executing agents.

13             THE COURT:  Right, so we're back to what

14   they did with my warrant as opposed to whether my

15   warrant was bad at the inception.

16             MS. PASSINO:  The two issues in the

17   alternative are both related to the execution of the

18   warrant -- the perspective of a person looking at the

19   warrant, executing the warrant -- I think that was

20   the tact that the motion tried to take.

21             THE COURT:  All right.  Let's talk about --

22   Part of your argument I think is that I allowed them

23   to take the computer, thereby allowing an offsite

24   search.  I think you contend that's improper.  Is

25   that right?

1          MS. PASSINO:  That was in the motion, yes.

2          THE COURT:  All right.  What's wrong with

3     that?  Did you want them to sit there and do their

4     search protocol for the next couple of days in the

5     apartment with all these people --

6          MS. PASSINO:  No, and --

7          THE COURT:  -- all his roommates sitting

8     around?

9          MS. PASSINO:  No.  My understanding is that

10    when a computer is -- I guess there's several parts

11    to getting to -- to making a copy.  So you image it,

12    you mirror it, whatever the terminology is, but that

13    that process doesn't require you to once you've done

14    that to sit there and perform the search on site.

15    You can then take your copy of the hard drive

16    wherever you want to take it, leaving the original

17    there.

18         THE COURT:  Okay.  If the computer is an

19    instrumentality of the criminal offense, do you just

20    leave it with the suspect?

21         MS. PASSINO:  No.  Rule 41 allows

22    instrumentality obviously to be seized.

23         THE COURT:  And you've heard Mr. Weddle's

24    argument that seizure of the actual computer was in

25    part because it was an instrumentality.  What do you

1 say about that?

2    MS. PASSINO:  Whether or not the computer

3 itself was an instrumentality, I don't think goes to

4 whether or not there was reason to either seize it or

5 search it but whether there was probable cause to

6 seize it or search it.  So its status as an

7 instrumentality, if it is, it's probably seizable, if

8 it's characterized by the government in that fashion.

9 That's not the crux of our argument.

10    THE COURT:  All right.  Do you believe

11 there was probable cause to seize the computer?

12    MS. PASSINO:  I'm not sure how to answer

13 that.

14    THE COURT:  Okay.  All right.  Go ahead.

15    MS. PASSINO:  I think I've probably

16 repeated this too much and I'll try and come to some

17 sort of conclusion here.

18    The argument about what and whether there

19 are limitations on the search of a computer, even

20 when pursuant to a search warrant, after it's been

21 seized, really isn't that different from what courts

22 have had to do before and that -- The Fourth

23 Amendment has had to accommodate new technologies

24 before.  The Fourth Amendment has -- from Olmstead

25 (phonetic) in requiring physical intrusion, to Katz

1    (phonetic) in recognizing invasion of privacy, to

2    Kyler, which says the Court's job is to ensure that

3    new technology doesn't infringe our traditionally

4    protected notions of privacy rights, that because to

5    date there is no computer exception to the Fourth

6    Amendment, that discretion -- that the warrant

7    limited the discretion, but that the executing

8    officers exceeded the scope of that authority.

9        THE COURT:  And is that because they went

10   into too many files or they went into files for too

11   long in your mind?

12       MS. PASSINO:  Without hearing proof about

13   what actually happened, and only having the results

14   of those searches, the problems are the number of

15   times that those files were accessed, the duration of

16   those periods of access, the number of people who

17   went in there --

18       THE COURT:  And I guess that's kind of my

19   question.  Let's suppose again we use the analogy of

20   someone going into a house or warehouse or business

21   looking for files in file cabinets, and they find

22   them.  They find 15 files out of a hundred that are

23   seizable, okay, and they bring them back.  Is it your

24   argument they can only have looked through those 15

25   files that one time, or when they bring them back,

1     they can continue to look through them everyday until

2     the trial if they want to?

3          MS. PASSINO:  I'm not sure that this

4     exactly answers the Court's question, but I think my

5     understanding of the government's response in part is

6     that if you have a right to be -- if you have

7     probable cause to at least in part search a computer,

8     then an electronic version of the plain view

9     exception is triggered.

10         In the case of the filing cabinets there's

11    still probable cause to -- required in order to

12    access that filing cabinet, which means the documents

13    that are seized for which there is probable cause --

14    look at them as many times as you want.

15         The documents for which there is no

16    probable cause -- I think that's more akin to the

17    situation in -- is it Andreson versus Maryland --

18    where the search warrant was executed.  Many types of

19    documents for which there was probable cause were

20    seized, but there was a whole -- you know, cases of

21    stuff that were unrelated to the purpose of the

22    warrant.

23         Those documents I think first were

24    suppressed and then some -- first were excluded and

25    then later suppressed.  And I may be getting that

1    wrong.  But the number of times that a file is

2    opened, if there is probable cause to open that file,

3    is a separate question from the number of times that

4    a file for which there is no probable cause that's

5    unrelated to the allegations in the search warrant

6    affidavit was opened.

7         THE COURT:  Are you contending that files

8    for which there was no probable cause were opened

9    more than once?

10        MS. PASSINO:  I don't know.  I don't know.

11        THE COURT:  Okay.  Not knowing if they were

12   opened simply once to determine if it was a file that

13   met the criteria or not, they determined it wasn't

14   and they closed it, didn't go back and reopen it,

15   would that be a problem if it turned out to be in

16   fact a government class set of notes, and they said,

17   well, that's not it, and went on to the next file?

18        MS. PASSINO:  I know that the extra reports

19   are not in the record and I don't want to go into

20   them too much, but if the Court would allow me to

21   give an example.

22        THE COURT:  Okay.

23        MS. PASSINO:  Some of the items included in

24   the final report are personal e-mails between

25   Mr. Kernell's aunt and uncle, including Pay Pal

1     information, their credit card information, and user

2     e-mails months before anything relevant to the

3     allegations in the search warrant affidavit.

4             THE COURT:  And where did you say those

5     were?

6             MS. PASSINO:  These were attachments to --

7     Some of the attachments were also incorporated within

8     the body of the report, but there were personal

9     e-mails unrelated to Mr. Kernell that were included

10    in the final report.

11            THE COURT:  And what does that mean?  They

12    were looked at?  They were looked at once?  They were

13    looked at a hundred times?

14           MS. PASSINO:  And they were relied upon.

15           THE COURT:  Now, wait a minute.  I asked

16    you a question.  What does it mean a file report?

17    Does it mean they didn't look at it?  They did look

18    at it?  They looked at it once?  What does -- I don't

19    know what you're telling me.  I understand there's an

20    e-mail between him and his aunt.

21           MS. PASSINO:  The final forensic evaluation

22    of the computer --

23           THE COURT:  Right.

24           MS. PASSINO:  -- included copies of

25    personal e-mails.  While I don't know how many times

1    those e-mails were looked at -- I'm looking at them

2    right now -- is unsupported by the search warrant

3    affidavit.

4            THE COURT:  Maybe we're having a

5    disconnect.  I'm not sure what you're telling me.

6            MS. PASSINO:  I apologize.

7            THE COURT:  They looked at an e-mail and

8    they shouldn't have?

9            MS. PASSINO:  They looked at an e-mail that

10   was not relevant and --

11           THE COURT:  How would they know that until

12   they read it?

13           MS. PASSINO:  Having -- Once something is

14   looked at I think -- that's like the filing cabinet,

15   you can see this is or isn't what you're looking for.

16           THE COURT:  Okay.  So they looked at it.

17           MS. PASSINO:  So they looked at it --

18           THE COURT:  There's nothing wrong with

19   looking at it to see if it's relevant.

20           MS. PASSINO:  Well --

21           THE COURT:  Is there?

22           MS. PASSINO:  -- maybe.

23           THE COURT:  I have to deal with beyond

24   "maybe".

25           MS. PASSINO:  If it were an irrelevant

1     document within the relevant time period, I think

2     that's different from an irrelevant document outside

3     the relevant time period.

4     THE COURT: Okay. So once they look at it,

5     if they say it's not relevant, then they don't look

6     at it again?

7     MS. PASSINO: Then they don't make it part

8     of a final report submitted as part of --

9     THE COURT: Well, what does the final

10    report say? These are all the files we looked at

11    that we think are relevant? These are all the files

12    we looked at? These are all the files we seized? I

13    mean what's the universe of files that are being

14    disclosed to you in the expert report?

15    MS. PASSINO: I would assume files that

16    they are relying upon to establish their case.

17    THE COURT: Okay. All right.

18    MS. PASSINO: All right. If the Court has

19    no further questions --

20    THE COURT: All right. Let me hear from

21    the government.

22    MR. GOLDFOOT: Good morning, Your Honor.

23    Once again my name is Josh Goldfoot. I'm a

24    travel attorney with the Computer Crime & Electronic

25    Property Section.

1         Your Honor, the warrant in this case

2    authorized the search of the computer pursuant to a

3    protocol that has been approved by courts in various

4    jurisdictions for over a decade of precedent.

5         The defense has not cited any cases in

6    which any court in the country has ever suppressed

7    computer evidence based on a search of this type, nor

8    has the defense suggested any way in which the

9    particular execution of this warrant was

10   unreasonable.

11        THE COURT:  We'll take that up later, the

12   execution.

13        MR. GOLDFOOT:  Yes.

14        THE COURT:  We're sticking with the

15   probable cause to issue a warrant at this point.

16        MR. GOLDFOOT:  On probable cause, Your

17   Honor, we haven't heard any -- we haven't seen any

18   argument in the motion filed in January or today that

19   disputes that this affidavit tells a story that leads

20   to the inescapable conclusion that inside that

21   apartment was records of the offense described in the

22   warrant; nor have we found much of a dispute that

23   within that apartment the computer records at least

24   were going to be found on the defendant's computer

25   that was seized.

1          Even the defense has conceded in their

2    motion that the warrant authorized the search for at

3    least some files on that computer.  To the extent --

4    So I'm not sure, therefore, how probable cause is

5    even at issue.  We have a concession that there was

6    probable cause to believe that at least one file on

7    that computer was called for by warrant and was

8    supported by the affidavit.

9          The only issue, Your Honor, becomes whether

10   the particular method of search of examining the

11   computer and files in that computer to determine

12   which of those files fell within the warrant was

13   proper.

14         And it's there, Your Honor, where they

15   essentially from that spinoff two legal arguments.

16   One of those legal arguments claiming that there

17   wasn't probable cause and the other saying that if

18   the warrant authorized that, it was a general

19   warrant -- although we'll discuss that issue

20   separately.

21         I believe the only execution argument

22   that's briefed is another spinoff of that same

23   argument that looking at every file is in some way a

24   violation.

25         But, Your Honor, that process of examining

1         every file on a computer to isolate the files that

2         are in fact called for by the warrant has

3         specifically been signed off on not only by the Sixth

4         Circuit in Guest versus Leis, not only by Judge Greer

5         adopting magistrate recommendation in this circuit in

6         United States versus Tillotson, but, Your Honor, the

7         warrant in this case -- I should say both of the

8         warrants as there were two -- we've only heard

9         discussion of one -- specifically previewed for the

10        Court that just such a procedure would be applied to

11        the computer in this case.

12             Now, when the warrant in advance gives the

13        magistrate reviewing it notice of some indication of

14        how the search is going to be executed, I've not

15        heard of a single case that has successfully made an

16        argument that there was a search in flagrant

17        disregard of the warrant with respect to its

18        execution when you're doing exactly what you told the

19        magistrate in advance you would do.

20             I see the Court flipping through the

21        warrant.  Would you like a page reference?

22             THE COURT:  Well, when you say the warrant,

23        you mean the affidavit?

24             MR. GOLDFOOT:  I'm sorry.  Yes, I mean the

25        affidavit.

1          THE COURT:  You just need to be particular.

2          MR. GOLDFOOT:  It's a bad habit of mine.

3          THE COURT:  Warrant sometimes is used as

4     all inclusive of all things attached to it.  But in

5     this case we're having to break it down.

6          MR. GOLDFOOT:  Yeah, absolutely.

7          I'm referring to the affidavit in support

8     of the September warrant.  Now, there is also a

9     warrant on a --

10          THE COURT:  And what part are you referring

11    to specifically?

12          MR. GOLDFOOT:  Give me a moment, please.

13    (Looking.)  Page 11 of the September warrant

14    affidavit, paragraphs 31 and 32, give sort of a

15    preview --

16          THE COURT:  Right.

17          MR. GOLDFOOT:  -- of how this is going to

18    happen.

19          Now, it mentions there that I know that in

20    order to completely and accurately retrieve data

21    maintained on computer hardware on computer software

22    yada, yada, yada, (sic) it is often necessary that

23    some computer equipment, peripherals, rates,

24    instructions, yada, yada, be seized and subsequently

25    processed by a qualified computer specialist in a

1    laboratory setting.

2            Right there giving the reviewing magistrate

3    notice that the entire computer is going to be

4    seized, taken to a laboratory, and processed there.

5    That's the exact procedure that's now being

6    challenged as flagrant disregard in this motion.

7            THE COURT:  Okay.

8            MR. GOLDFOOT:  Now, while we're still

9    talking about the subject of probable cause, there

10   seems to be an argument, which wasn't clear to me

11   from the brief, but that it was necessary to have

12   probable cause to justify a particular step taken in

13   executing a warrant.

14           That is not the purpose of probable cause.

15   The probable cause is required to -- excuse me --

16   probable cause to believe that contraband or evidence

17   of a crime or instrumentality of a crime will be

18   found in the location to be searched.

19           The warrant process is not about how

20   evidence will be searched.  It is about what may be

21   searched.  Issues pertaining to the execution are not

22   decided during the period when the magistrate reviews

23   the warrant but decided after the fact.

24           The two cases from the Supreme Court that

25   tell us that, but not in computer context, would be

1      United States versus Groves (phonetic) and United

2      States versus Dolly (phonetic). They're both cited

3      in our brief.

4            I don't want to take up the Court's time

5      unnecessarily discussing the answers to questions the

6      Court already knows, but if there are other issues

7      that the Court is interested in, I'd be happy to

8      address them.

9            THE COURT: No. I think on that issue I'm

10     okay.

11           MR. GOLDFOOT: Then the United States has

12     nothing further on the probable cause issue.

13           Would you like me to proceed to the other

14     issues that were discussed now or --

15           THE COURT: No. I want to see if

16     Ms. Passino has any response.

17           MR. GOLDFOOT: All right. Thank you.

18           MS. PASSINO: Just a much shorter response

19     than the first time I was up here.

20           I would say that Guest versus United States

21     versus Tillotson cited by the government just now --

22     neither case presents facts similar to those alleged

23     in the affidavit. And both cases suggested the

24     nature of the crime under investigation is a

25     consideration when determining how much of -- the

1    scope of the search of the computer.

2        Page 11 of the affidavit -- I'm not sure

3    how that is a preview.  It does not seem to set out

4    what forensic -- what the forensic examine would look

5    like other than to say that a forensic examination

6    will be done and --

7        THE COURT:  What do you propose would be

8    the proper language in a search warrant to limit with

9    the sufficient detail you propose the places to be

10   searched?

11       MS. PASSINO:  I think that would be a

12   case-by-case determination.

13       THE COURT:  Well, use this one.  Tell me

14   what would be a proper language?  You can only search

15   in what?

16       MS. PASSINO:  I think one of the easiest

17   ways that says you can only search in -- you can only

18   search in parts of the computer relevant to the dates

19   in which the allegations are referenced to.

20       A computer -- a hard drive is unlike a

21   house, so I don't want to say that only certain parts

22   of it can --

23       THE COURT:  Well, I don't limit anything

24   else that way, do I?  In other words, I think you use

25   the example of going to search for say a stolen

1    lawnmower.

2          Okay.  So I say, well, I've got after an

3    affidavit of people who have seen it at this

4    residence and have pictures of it and all that --

5    that I have reason to believe that that lawnmower

6    will be found at that residence.  Okay?

7          Well, that may give them probable cause to

8    search the residence to see where the lawnmower is.

9    Do I have to put in there that you may not search the

10   drawers in the kitchen, because that wouldn't be

11   proper to be looking in a drawer in the kitchen for a

12   lawn mower.

13         MS. PASSINO:  No --

14         THE COURT:  So that would go to exceeding

15   the scope, but do I have to put that in a warrant,

16   that I make a trip to the house first to find all the

17   places where I don't want them to look?

18         MS. PASSINO:  There are -- And although the

19   name of is escapes me, but there are Supreme Court

20   cases that say you don't look for a firearm in a

21   space that a firearm couldn't fit.

22         THE COURT:  Exactly.

23         MS. PASSINO:  With bits of data you do need

24   to be more specific.  And I think that was the final

25   point that -- The government ignores the

1    particularity requirement when it says that there

2    must be probable cause for an item.  There must be

3    probable cause for an item that has been particularly

4    described.

5         So the lawnmower can't fit in a drawer but

6    a bit of data can fit in other places.  And I don't

7    know --

8         THE COURT:  So you have to look everywhere.

9    It's sort of like looking for drugs in the house as

10   opposed to looking for a lawnmower.  You look

11   different places.

12        But the probable cause for the search

13   warrant itself, which is all we're arguing right now,

14   is the same.

15        The issue that would be the problem would

16   be after a completely proper search warrant was

17   issued but that agents or officers decided to exceed

18   it and start looking everywhere and rummaging, which

19   is the second part of your argument.  But I'm still

20   on the first part.

21        MS. PASSINO:  And I don't know this is an

22   example that the Court has heard many times before,

23   but I heard it for the first time recently, which is

24   that I think it's a gigabyte of information is

25   equivalent to a stack of paper the height of the

1         Washington Monument, 555 feet tall.  So that a

2         16-gigabyte computer, like the one that was seized

3         from Mr. Kernell --

4                     THE COURT:  Uh-huh.

5                     MS. PASSINO:  -- that I think is

6         categorically different from a house with a lawnmower

7         because the particularity required under the Fourth

8         Amendment is something that can be -- that is

9         required on the front end to limit the places in

10        which that's searched.

11                    And when you've got that many documents

12        involved and that much information involved to

13        leave -- to have unfettered discretion to search

14        anywhere when there are ways in which it could be

15        limited is I think where we differ with the

16        government.

17                    THE COURT:  All right.  Maybe I'm beating a

18        dead horse, but I'm going to try to ask this one more

19        time in a different way.

20                    It seems that you're arguing that if I had

21        issued a search warrant for the lawnmower and the

22        officers or agents had gone through the drawers, that

23        that would have been improper, but you make the

24        argument by saying not only did they exceed the scope

25        of the warrant but your warrant was bad to begin with

1      because you knew they were going to do that, or you

2      allowed them to do that, or you didn't place

3      limitations that kept them from doing that.  Ergo,

4      simply issuing a search warrant for the lawnmower,

5      even though there is probable cause to believe it was

6      there, was wrong because you shouldn't have done it

7      until you put all this other stuff in the search

8      warrant.

9              Now, I'm trying to figure out where you get

10     any support for that.

11             MS. PASSINO:  The --

12             THE COURT:  And again is that going to be

13     the case now in your mind with other matters that

14     don't involve computers?

15             MS. PASSINO:  The government is correct

16     that this isn't -- that the common practice is to do

17     what was done -- what they sought to do, which is to

18     seize a computer and search it.

19             But those cases did not present the

20     opportunity to talk about a brief crime, a one-time

21     thing, versus -- I don't want to say in most cases

22     but the cases that both sides have argued are cases

23     factually different, so that there wasn't the

24     established protocol for putting a protocol into a

25     search warrant.

1    It sort of skips over the issue, which is

2    the attachment to the warrant limited in paragraph

3    one the documents and computer files that the

4    government could search for, that that limitation

5    must have been flagrantly disregarded if that

6    limitation wasn't abided by.

7    So not knowing what the Supreme Court may

8    eventually say on this point, the point that is there

9    in the precedent goes to the manner of the execution,

10   that when there are limiting terms in a search

11   warrant -- and even though there wasn't a protocol in

12   this warrant, what there was was some kind of stopper

13   on the discretion of -- to search everywhere and

14   everything.

15   And I think once again I haven't quite

16   answered your question which is to say that --

17   THE COURT:  Well, I think that I know that

18   we may be dealing with a little bit of semantics, and

19   I want to get to that in one second.

20   I want to ask you one last question about

21   another issue, when you keep talking about the

22   one-time thing, the one-time event.

23   And suppose again there was a one-time

24   event in a business, and there's testimony that this

25   document was created, and there's probable cause to

1    believe that it exists, and it was, quote, stuck in a

2    filing cabinet.

3            Now, how will they find that one document

4    or two documents that were created in a one-time

5    event without going through the entire filing cabinet

6    looking for it?

7            MS. PASSINO:  I think when I refer to a

8    one-time document in contrast to sort of a pervasive

9    scheme of criminal activity, what the distinction I'm

10   trying to bring to the Court's attention is that as

11   with any kind of search warrant the search warrant is

12   issued based on the probable cause given the

13   particular facts in a specific case.

14           So even if a business were engaged in a

15   one-time thing and next door there was a business

16   engaged in lots of things for which there was reason

17   to go in and search their files, I think that gets to

18   the reasonableness of the execution of the warrant,

19   the number of times, the duration.

20           And that may be difficult to say on the

21   front end, but I think it's clear looking at what has

22   happened that that wasn't the case here, that there

23   is -- that there shouldn't be a one-size-fits-all-

24   computer exception.

25           THE COURT:  What I think we're having a

1     problem with in the semantics is I think the issue is

2     what they were searching for as opposed to what they

3     were searching in.  I think you don't have problems,

4     do you, with what they were searching for?

5          MS. PASSINO:  That's not the focus of our

6     argument, no.

7          THE COURT:  Okay.  The focus of your

8     argument is they searched in files and places that

9     they had no business going.

10         MS. PASSINO:  In part, yes.

11         THE COURT:  All right.  Anything more on

12    that issue from either side?

13         MR. GOLDFOOT:  No.

14         THE COURT:  All right.  Let me hear at this

15    point from the government about why I shouldn't allow

16    some form of an evidentiary hearing when it seems to

17    be part of your argument that a reasonableness

18    determination should be made after the execution of

19    the warrant?  And that's the judicial review that

20    remains available for the protection of the suspect.

21         MR. WEDDLE:  And, Your Honor, if the

22    defendant had specified any evidence at all as being

23    outside the scope of the warrant, that might

24    certainly be the appropriate way to proceed.

25              In this case the defendant has only said

1    the scope was exceeded and said at some point, well,

2    we're not prepared to go forward until we see the

3    government's expert report and that way we'll know

4    what evidence was seized and what evidence the

5    government is relying on.

6         Well, we have provided that.  And still to

7    this date there has been no identification of any

8    specific file, data, document, or other evidence that

9    they say -- the defendant says is outside the scope

10   of the warrant -- was taken outside of the scope of

11   the warrant, and what the defendant wants to do is

12   simply put the government's agents on the stand to

13   see if they can come up with something and I guess

14   ask how many times did you look in a file, how many

15   people looked, how long did you look.

16        That's not proper examination and that's

17   not the proper subject, Your Honor, until the

18   defendant I think -- and the defendant has the

19   burden -- until the defendant can specify, "File A,

20   B, C was outside the scope of the warrant because,"

21   then we're in no position to put on any evidence.

22        THE COURT:  So you're saying the defendant

23   has to specify evidence that was seized that was

24   outside the scope of the warrant, not searched?

25        MR. WEDDLE:  Yes.

1          THE COURT:  Because they can't possibly

2      know what you searched, can they?

3          MR. WEDDLE:  Yes, they know what we

4      searched.  We searched the computer.

5          THE COURT:  So it's every file?  So why do

6      they need to limit --

7          MR. WEDDLE:  Well, they certainly know and

8      they certainly concede that some files were within

9      the scope of warrant.

10          THE COURT:  Right.

11          MR. WEDDLE:  So until the defendant

12      designates what files are outside the scope -- I mean

13      perhaps if those are identified, I think we have a --

14      we should have an opportunity at that point to at

15      least brief, okay, why is this outside the scope,

16      before we talk about -- before we put agents on the

17      stand to say, well, tell me how you did this search.

18          Because it may be that the evidence -- it

19      may be that the file that the defendant says is

20      outside the scope of the warrant, fine, we won't use

21      that.  No need for any evidence.

22          We're putting the cart before the horse,

23      Your Honor, is all I'm suggesting.  Until the

24      defendant can come forward and make some showing

25      about what specifically is outside the scope of the

1    warrant, then there's no need for any evidence on it.

2            And that's our position, Your Honor, and

3    especially as it applies to putting government agents

4    on the stand, which I think is kind of a separate but

5    related issue.

6            THE COURT:  What about this line, "Agents

7    operate under significant restrictions when they

8    search a hard drive.  As with any search, the manner

9    in which a warrant is executed is subject to later

10   judicial review as to its reasonableness."

11           MR. WEDDLE:  I think that's absolutely

12   true, Your Honor.

13           THE COURT:  And how does one conduct a

14   judicial review of the manner in which a warrant is

15   executed without inquiring as to the manner in which

16   a warrant was executed?

17           MR. WEDDLE:  The Court need -- What I'm

18   saying is the Court need not conduct such a review --

19   or the review is conducted only with respect to the

20   evidence which is alleged to be outside the scope of

21   the warrant.

22           For instance, the lawnmower.  You've got a

23   warrant to go seize a lawnmower, and what the

24   government does is they bring back a kitchen knife

25   and say, We want to put this into evidence.  Fine.

1     Was that outside the scope of the warrant?  That

2     would be subject to review.  How did you get that

3     knife?  What allowed you to go into the kitchen

4     drawer to get that knife --

5          THE COURT:  I agree with that part.  Okay.

6     Maybe their argument is plain view or anything else.

7     That's not my point.

8          MR. WEDDLE:  But to simply say the

9     government got a lawnmower but they went through the

10    kitchen drawers as well.  So?

11         THE COURT:  What do you mean "so"?  Do you

12    think it's okay that the government can just stand up

13    and say you told us to go look for a lawnmower, but,

14    you know what we did?  We went through every drawer

15    in that house.  We went through all the kids' stuff.

16    We went through their computers.  We went through

17    everything.  And our answer is "so".  So what?

18         MR. WEDDLE:  No, Your Honor.  I'm telling

19    you that that then goes to whether it was a general

20    warrant.

21         THE COURT:  What if the warrant was very

22    specific?  It said go only find a lawnmower.

23         MR. WEDDLE:  Right.

24         THE COURT:  But you went way beyond going

25    to look for a lawnmower.  You looked in all these

1     places a lawnmower couldn't be.  Are you saying that

2     converts an otherwise really good search warrant into

3     a really bad search warrant?

4            MR. WEDDLE:  No.  What I'm saying, Your

5     Honor, is what is the evidentiary -- what is the

6     review?  What would the Court be reviewing at that

7     point?

8            THE COURT:  If the --

9            MR. WEDDLE:  To suppress the lawnmower?

10           THE COURT:  If the acts of the agents was

11    so far beyond the authorization to search that they

12    converted their search into a general search.

13          MR. WEDDLE:  Exactly.  Exactly, Your Honor.

14    And what I'm saying here is that I think we've moved

15    beyond that.

16          Until the defendant can for instance say

17    that, well, this is why it's a general warrant,

18    because the agents went in and they rummaged through

19    the drawers, they rummaged through the closets, they

20    rummaged through the whole house, looking for a

21    lawnmower, that just shouldn't be allowed.

22          And what I'm saying here, Your Honor, is we

23    don't have that yet.  The defendant hasn't said

24    they've rummaged through files that they had -- And

25    these are the files they had no business rummaging

1  through.  This is the part of the computer they had

2  no business looking at.

3          And until they can articulate that I'm not

4  sure what evidence it is -- why the Court would be

5  taking any evidence, what the Court would be

6  reviewing.

7          THE COURT:  Well, part of the problem of

8  course is trying to limit that sort of an inquiry,

9  because I agree with you they haven't isolated those

10  except to talk about the e-mail between Mr. Kernell

11  and his aunt.

12          MR. WEDDLE:  Well, I think what they're

13  talking about is actually e-mail between third

14  parties, not Mr. Kernell, when Mr. Kernell did not

15  have the computer.

16          Now, that's taking -- Our position is

17  that's taken care of in the second warrant, which we

18  went back to the Court and asked for evidence of user

19  attribution.  We had to determine -- at that point we

20  needed to determine who was using the computer when.

21  But that's -- You know, that's a separate -- Fine, if

22  they want to hear evidence on -- take evidence on

23  that, we can do that, but that's covered by --

24          MR. DAVIES:  If there's a second warrant

25  and affidavit, we don't have a copy of that.  That's

1    part of our problem here is that we don't believe

2    that there was application to extend the scope of the

3    search beyond what was set out in the original

4    warrant.

5            THE COURT:  What do you say about that?

6            MR. WEDDLE:  I thought we had provided all

7    warrants to counsel.

8            THE COURT:  Well, do you have any problem

9    providing him with the second warrant and affidavit?

10           MR. WEDDLE:  Oh, of course not.  I thought

11    we had done so.

12           THE COURT:  It seems a little late to be

13    finding that out.

14           MR. DAVIES:  And that's never been at issue

15    in any of the government's responses.

16           THE COURT:  But irrespective of that, it

17    seems to me that the primary argument has been --

18    without putting words in their mouth, is that they

19    essentially say you looked through every file.  I'm

20    not going to sit here and list a million files.  I'm

21    just going to say all.  And you conceded in your

22    response, "We did look through every file."

23           MR. WEDDLE:  Right.

24           THE COURT:  So why should they say, okay,

25    we'll sit down and we'll list them all, and you will

1    take out the 10 or 15 that you had access to, and

2    we'll argue about each and every one of the others,

3    as opposed to just the generic, "You rummaged through

4    the entire computer, and you didn't have authority to

5    do that."

6              MR. WEDDLE:  And I guess what we're saying

7    is we did have authority to look through the whole

8    computer because that's what the warrant gave us the

9    authority to do.  We told the Court this is how we

10   have to look through a computer.  And that's how we

11   did it.

12             Now, we have after that fact -- And that's

13   why -- I mean I'm not -- I don't want to put words in

14   Mr. Davies' mouth either.  But I think that's why

15   Mr. Davies wanted this hearing to be continued until

16   he could get the government's computer forensic

17   report, so that he could see how -- what the

18   government looked through and what evidence was

19   obtained in that analysis.  He now has that.

20             And all I'm saying, Your Honor, is it's

21   time -- That being the case, let's identify then

22   specifically why you think we rummaged through files

23   that we weren't supposed to.

24             I mean I don't want to say I'm circular,

25   but I think that's what we were talking about earlier

1      today is what files we could actually look through.

2      And I think the warrant authorizes us to look through

3      all the files.

4             Now, that being the case now that the

5      report has been delivered to the defense I think it's

6      incumbent upon the defense to say, well, this is why

7      they were not -- they should not have been permitted

8      or the warrant didn't permit them to look through

9      this category of files, these kinds of files,

10     whatever.

11            And I think that's our position, Your

12     Honor.

13            THE COURT:  All right.  So basically it

14     would be your position that in searching the computer

15     you can't have an excessive search?

16            MR. WEDDLE:  I didn't say that, Your Honor.

17            THE COURT:  Well, if you search everything

18     in it, what else could there be?

19            MR. WEDDLE:  If we searched through a

20     computer, looked through all the files, and then it

21     later turned out that we discovered for instance we

22     were looking for evidence of this crime and we

23     discovered photographs and those photographs are,

24     say, of child pornography, so they're a separate

25     crime -- if we then go and conduct further searches

1    on that without going back to the Court, perhaps

2    we've exceeded the scope of the warrant.

3            But it's up to the defendant to say, well,

4    see, this is what the government did.  They looked in

5    these files and they found this, and they continued

6    to search for evidence of child pornography.  The

7    warrant did not give them the authority to continue

8    to search the computer for child pornography.  They

9    exceeded the scope of the warrant.

10           We don't have that here.  We haven't gotten

11   to that step yet.

12           THE COURT:  So when you put in your brief

13   that the touchstone of reasonableness which governs

14   the Fourth Amendment governs the method of execution

15   of the warrant and the reasonableness of the

16   officer's acts both in executing the warrant and in

17   performing a subsequent search of seized materials

18   remains subject to judicial review, are you saying

19   that this type of evidence that the defendant seeks

20   is appropriate but not yet?

21           MR. WEDDLE:  Yes.  Yes.

22           THE COURT:  And it's incumbent upon him to

23   identify the limits of the inquiry?

24           MR. WEDDLE:  Yes, or to at least raise --

25   make some showing of why it is that he says the

1      search was outside -- that the agents exceeded the

2      scope of the warrant.

3              THE COURT:  Okay.  You have no problem with

4      whatever analysis I make or decision I make

5      predicating it on the fact that basically all files

6      were looked into?

7              MR. WEDDLE:  Initially, yes.

8              THE COURT:  Okay.  All right.  Let me ask

9      the defense now.

10             If given that, and given your argument

11     first I think that looking into all files is

12     excessive, why do we need to break it down into

13     anything further?

14             MR. DAVIES:  Well, I think we need to look

15     at how they looked at every file.  And that's one of

16     the key issues for which we need an evidentiary

17     hearing.

18             THE COURT:  Why?

19             MR. DAVIES:  Well, it's interesting.  Most

20     of the questions that the Court was asking

21     Ms. Passino about how it can be limited -- how can

22     something be limited by subject matter, how could

23     something be limited by time, how could something be

24     limited by type of file -- Those are issues of fact

25     that I think can be answered by the agent because

1    it's really not that complicated.  They have forensic

2    programs that can -- My understanding is they can do

3    those things.

4          I think we're really making this more

5    complicated than we need to.  We have clearly alleged

6    that the execution was far beyond the scope of the

7    warrant because the warrant sets out in paragraph one

8    the limitations for what they're supposed to be

9    looking for.

10          And we have alleged that they did searches

11    on that computer, repeated searches, using different

12    programs, which we want to inquire about, that

13    resulted in really just a wholesale examination of

14    things that were completely irrelevant.

15          Now, what Mr. Weddle is saying I think --

16    You know, I think I now understand that.  What we've

17    done in the past, for example, on pleading that the

18    scope of a warrant was exceeded is to take the

19    return, for example, and to go through and identify,

20    for example, if there's a return, identifying

21    business records.  We've gone through and identified,

22    "We feel based on the language of the warrant that

23    these thousand records were seized in excess of the

24    scope."  And I've done that before.

25          The problem is there is no return -- We

1     don't have a return like that here.  We don't have a

2     list of the files that were examined and how they

3     were examined.  The forensic report --

4             THE COURT:  All right.  Let's stop because

5     we keep using terms I don't understand.

6             MR. DAVIES:  Okay.

7             THE COURT:  I don't think I've ever seen a

8     return that listed what was examined.

9             MR. DAVIES:  No, no.  I didn't mean to say

10    that.

11            THE COURT:  That's why I'm getting

12    confused.

13            MR. DAVIES:  Okay.  In a basic --

14            THE COURT:  And maybe we need to be very

15    careful with the use of our terms search and seizure.

16    They are two different things.  One searches a house;

17    one seizes what I authorized them to seize.

18            MR. DAVIES:  Right.

19            THE COURT:  Okay.  Go ahead.

20            MR. DAVIES:  Unfortunately in the computer

21    context it's done in the opposite order.  The seizure

22    occurs first and then the search occurs.

23            And that's why -- The example I was trying

24    to give is based on a traditional search for business

25    records, for example, where you go into a business

1    and seize file folders.  In that instance there would

2    be a return that sets out the file folders that were

3    seized and --

4              THE COURT:  But not every one that was

5    looked at?

6              MR. DAVIES:  Right, but what we would be

7    arguing there is that these thousand folders were

8    seized outside the scope.  It would be easy -- Well,

9    it would be possible to go through and highlight the

10   ones that we say --

11             And what I'm saying is that in this case we

12   don't have an inventory that shows every computer

13   file that was examined and how.  What we do have is a

14   forensic --

15             THE COURT:  But you wouldn't have that if

16   they were searching through a file cabinet.

17             MR. DAVIES:  I believe we would.  I think

18   --

19             THE COURT:  They wouldn't give you an

20   inventory of every file they looked into --

21             MR. DAVIES:  Or you could make --

22             THE COURT:  Pardon?

23             MR. DAVIES:  -- or you could make one just

24   by looking at them.  You could identify them fairly

25   easily, the ones you say were outside the scope.

1          Here what we've got is we've got a forensic

2     report.  The forensic report identifies certain

3     things like the types of software that were used, the

4     basic types of examination that were done.

5          It doesn't give us any detail as to how or

6     the scope, the timing, how long it took.  And we

7     don't have a list of the files that were examined.

8     Now, we can --

9          THE COURT:  But my point is -- and I keep

10    getting back to this -- you don't do that in anything

11    else, any other setting.  You don't get a return that

12    says here's exactly how we went through the file

13    cabinet, or one that says here is how long we took in

14    drawer one, drawer two, or here's how long we took in

15    the entire filing cabinet.  You don't get that kind

16    of breakdown.  Right?

17          MR. DAVIES:  Right.

18          THE COURT:  My concern is that if --

19    partially -- part of my concern is why I should even

20    do that in this case.  But if I did, then would I

21    have to then do that for all other searches?  You

22    know, if you're searching files on a computer, you'd

23    have to do it; so if you're searching files in a file

24    cabinet, you've got to do it, too.

25          MR. DAVIES:  Yeah, and I'm not sure I

1    understand how this would lead to any kind of

2    expansion, and maybe my example made it too

3    complicated.

4           But all I'm saying is if you've got pieces

5    of paper, you can go look at them, and you can see

6    what the government seized.  You can just look at

7    them and identify for the Court which ones you say

8    were outside the scope.  Here you can't do that.

9           THE COURT:  You haven't been provided what

10   was seized?

11          MR. DAVIES:  We've been provided with the

12   hard drive and with the forensic report, but there's

13   no --

14          THE COURT:  Why isn't that the functional

15   equivalent of being provided the file cabinet with

16   all the documents in it?

17          MR. DAVIES:  Well, because there's no way

18   you can look and tell from the material that we've

19   got which files have been examined and how extensive

20   it was.

21          THE COURT:  They said they looked at them

22   all.  They've agreed I can make my ruling premised on

23   the notion they looked at every single file.  You

24   can't find one that they didn't look at.

25          MR. DAVIES:  And so what we would say is

1     that the files -- Well, it's really not that simple,

2     but the files that were -- what was done that was

3     outside the scope of the warrant deals both with

4     which files were examined and how.

5            THE COURT:  They were all examined.

6            MR. DAVIES:  And how is another key

7     question, because, look, if you are running a

8     forensic program, for example, that takes paragraph

9     one of the warrant and puts in those items, the

10    e-mail address gov.palin, you know, for example --

11    the e-mail addresses that we're looking at -- and you

12    are searching forensically with a computer search

13    program for files containing those key terms, and you

14    are limiting the search to the date -- the

15    approximate date upon which these allegations

16    occurred, then there might be an argument that you

17    are not exceeding the scope of the warrant.

18            But if you were expanding your search and

19    are just examining every single thing to see

20    everything that's on there, then you are exceeding

21    the scope.

22            And that's why we need to put on evidence

23    to show what programs were used, to what extent they

24    actually looked at the information that is in

25    nonrelevant files, how long that took, what the

1    intrusion was.

2           We can -- We could point to the Court some

3    instances where it's very clear from the report that

4    there were files that were both examined and used

5    that don't have anything to do with what this Court

6    gave the government authority to do.

7           And I would just give as an example -- This

8    was a secondhand computer and it came from

9    Mr. Kernell's aunt and uncle.  The IP address that is

10   involved in this case, Mr. Kernell's IP address,

11   wasn't used until September 2nd, 2008.

12          There is apparently -- and we can't tell

13   exactly how much from the report, but there was

14   apparently a wholesale examination of the e-mail

15   correspondence from other IP addresses that involved

16   Mr. Kernell's aunt and uncle before he ever had the

17   computer.

18          And essentially there's no way we can prove

19   our allegations without an evidentiary hearing.

20          THE COURT:  Okay.  I'm going to take a

21   short break.  I want to ask one question before I do.

22          Mr. Weddle, are you contending anything

23   seized in this case was seized beyond the parameters

24   of the warrant?

25          MR. WEDDLE:  No.

1          THE COURT:  All right.  So there's not

2     going to be any argument of plain view.  There's not

3     going to be any argument of probable cause or

4     something that was illegal, anything like that.

5     Okay.

6          MR. DAVIES:  Can I just say one more thing

7     I forgot to say?

8          THE COURT:  Sure.

9          MR. DAVIES:  And that is if it's the

10    government's position that the defendant has to

11    particularize evidence, that it has been seized

12    outside the scope of the warrant, that's impossible

13    to do thoroughly.

14          What is possible would be to give the Court

15    examples that are set out in the forensic report, but

16    it would be impossible without having the ability to

17    obtain information from the forensic examiner to

18    identify everything that we say is outside the scope.

19          THE COURT:  Did the government identify all

20    the documents that it claims it seized as opposed to

21    searched; that is, documents that relate to rubico,

22    rubico10, Gov. Palin, or did you just give them back

23    a hard drive?

24          MR. WEDDLE:  We just gave them back a hard

25    drive, Your Honor.

1          THE COURT:  So they don't know -- as

2     opposed to in a search for documents case in a

3     warehouse or a business where you went through 10

4     file cabinets and selected 20 documents as being

5     within the scope.  You would make copies of those, or

6     you would take the originals, and you would do a

7     return, saying these are what we seized.  We went

8     through 10 file cabinets, but we only took these

9     documents.  Now, what's wrong with doing that in this

10    case --

11         MR. WEDDLE:  Well --

12         THE COURT:  -- instead of saying -- What

13    you're saying essentially is we went through the 10

14    file cabinets.  We stuck these documents back in

15    there.  You guess which ones we took.

16         MR. WEDDLE:  Well, I think we've done

17    better than that really.  We provided computer

18    forensic reports which show the files that have been

19    seized and analyzed and how they relate to one

20    another.

21         THE COURT:  Okay.  You're shaking your

22    head.  You're saying you didn't get that?

23         MR. DAVIES:  Well, I guess it depends on

24    what analyzed means.  I mean if they -- The only

25    thing that's in the forensic report is examples.  So

1    they haven't set out every file that has been seized

2    and analyzed.  There's a list of exhibits that are

3    made examples.

4          I have no idea whether we're talking about

5    10 million files that have been analyzed or -- you

6    know, the report consistently says this is attached

7    as an example, so there is no way --

8          THE COURT:  I haven't been provided with a

9    copy of that report.

10          MR. DAVIES:  I understand that.

11          THE COURT:  So I'm having a hard time

12    knowing what it looks like.

13          MR. DAVIES:  All these arguments are based

14    on issues of fact.

15          THE COURT:  All right.  Let me take a short

16    recess.  We've been going at it for a pretty good

17    little while.  Everybody probably needs a break.

18    We'll come back in about 10 or 12 minutes.

19          THE COURTROOM DEPUTY:  All rise.

20          (A recess was taken.)

21          THE COURTROOM DEPUTY:  All rise.  This

22    Honorable Court is again in session.

23          Please, be seated.

24          THE COURT:  All right.  With regard to a

25    evidentiary hearing, the Court is not inclined at

1    this time to grant that for the following reasons:

2    One of the reasons to grant an evidentiary hearing

3    would be if items seized in the case were seized

4    based on reasons other than the argument that they

5    came within the warrant.

6    For example, plain view is the most common

7    one. Those require an evidentiary hearing. The

8    government has conceded that none of its seized items

9    in this case are being claimed as being seized other

10    than pursuant to the warrant.

11    The second reason proffered for an

12    evidentiary hearing has to do with the scope of the

13    search actually conducted by the government agents.

14    However, in this case the government has conceded,

15    and for purposes of my ruling I will take it as

16    conceded, that the search included searching all

17    files and items on the defendant's computer.

18    I really don't find that the defendant has

19    raised any significant question regarding the scope

20    of the search or the execution of the search beyond

21    the fact that the government searched every file. At

22    this juncture I don't feel like how they searched

23    every file is a basis for an evidentiary hearing.

24    Therefore, it appears to the Court that I

25    must first determine if the act of looking in every

1     file to find the appropriate documents and

2     information is either beyond the scope of the search

3     warrant or beyond what is legally permissible so as

4     to convert it into a general search.  If not, there's

5     no need for an evidentiary hearing.  If I find

6     otherwise, it may be the basis for an evidentiary

7     hearing.

8           But I think I have to make that call first,

9     and I'm not prepared to do that today.  So I've got

10    to look and see what my ruling is on that and that

11    will guide me as to whether or not I think there is a

12    basis for an evidentiary hearing.

13          Now, another issue that came up was with

14    regard to the second search warrant and affidavit,

15    which I understand Mr. Weddle is going to get to

16    Mr. Davies.  And I'm going to insist, unless you have

17    any objections, that you get it to him within the

18    next 24 hours.

19          MR. WEDDLE:  I can give it to him -- a copy

20    right now, Your Honor.

21          THE COURT:  All right.  I also want you to

22    check and see if there is anything else.  I don't

23    want any time we show up to find out there's other

24    discovery.  So if you wouldn't mind --

25          MR. WEDDLE:  I'll go back and doublecheck.

1    We have been doing that, Your Honor, and I thought

2    this was covered.  If it had not been provided prior,

3    I apologize to the Court and Mr. Davies.

4         THE COURT:  All right.  As much as I'm

5    reluctant, I think I have to give the defendant some

6    additional time to consider filing another motion on

7    any new discovery.  At this point all I know about is

8    that, but if there's anything you give him tomorrow

9    or the next day --

10        Accordingly, Mr. Davies and Ms. Passino,

11   I'm going to give you until July 27th to file any

12   additional motions, limited to new discovery.  I'll

13   give the government, if anything is filed, until

14   August the 3rd to respond.

15        I am not going to set a hearing at this

16   point.  Often I do that.  It's easier to cancel them

17   than it is to schedule them, but at this point I have

18   no real strong basis to believe that there will be a

19   motion filed, although there might be.

20        But if there is, Mr. Davies, I'm going to

21   put the onus on you to get with Mr. Weddle and my

22   office to set a hearing.  And we need to do that

23   promptly, because we're still staring at an October

24   trial date.  And if things are still being filed in

25   late July and early August, that's making that trial

1  date a little difficult.

2         MR. WEDDLE:  Yes, Your Honor.  And I can

3  state that regardless of the second search warrant

4  the government is relying on the initial search

5  warrant for the authority for searching and seizing

6  the computer files.  So I do think that this will

7  really not raise any new issues.

8         THE COURT:  All right.  I understand.

9         All right.  Is there anything else that we

10  need to take up today?

11         Mr. Davies, you had a motion to authorize

12  issuance of subpoenas for pretrial production --

13         MR. DAVIES:  Yes, Your Honor.

14         THE COURT:  -- of evidentiary material that

15  we put off because you wanted to see what was

16  ultimately produced short of that.  Where are we on

17  that?

18         MR. DAVIES:  Can I ask one question for

19  clarification?

20         THE COURT:  Yes.

21         MR. DAVIES:  In essence the Court is going

22  to postpone ruling on Mr. Kernell's right to an

23  evidentiary hearing until making the decision as a

24  legal matter as to whether an examination of every

25  file is beyond the scope of the search warrant?

1          THE COURT:  Or otherwise improper, yes.

2          MR. DAVIES:  Okay.

3          THE COURT:  And if I were to find that it

4     was beyond the scope of the search warrant, or if I

5     was to find that that was improper, converting it

6     into a general warrant or otherwise for the argument

7     that you made, then it might be that testimony

8     regarding what was done would be very relevant and

9     germane.

10         MR. DAVIES:  So at this point I'm just

11    thinking about in terms of Mr. Kernell's need to

12    place things in the record.  I'm going to hold off on

13    asking the Court to allow me to make a proffer of

14    what we will do until we get the ruling as to whether

15    or not we're going forward with the evidentiary

16    hearing, just simply because it's very important to

17    us to show not only the fact that every file was

18    looked at, but how I guess is the best way to say it.

19         So at this point if it seems -- that seems

20    like a proper course of conduct, I'm not going to try

21    to proffer something into the record simply because I

22    understand the issue is still pending.

23         THE COURT:  Okay.  Now, Document 36 -- Did

24    you resolve that?

25         MR. DAVIES:  I resolved that the motion --

1          I don't believe the motion needs modification at this

2          point.  And that's why I wanted to wait and look at

3          the additional discovery -- The real question I had

4          was whether the discovery I had received the day

5          before the last hearing made that motion moot or

6          whether it needed -- otherwise needed to be changed.

7                  But our position is still the same, that

8          this is a case involving obviously highly technical

9          aspects of both the facts and the law and that under

10         Rule 17(c) simply those items that we have asked for

11         satisfy the four-factor test for allowing pretrial

12         production of certain documentation.

13                 THE COURT:  What is the motion?  Let me

14         look at your motion.  (Looking.)  I at least

15         understand the subpoenas to Yahoo and to 4chan.  Tell

16         me about the other subpoena.

17                 MR. DAVIES:  Okay.

18                 THE COURT:  And particularly in light of

19         the recent developments tell me about the other

20         subpoena.

21                 MR. DAVIES:  Well, I think -- The recent

22         development, meaning the fact that the governor has

23         expressed an intention to step down from the office?

24                 THE COURT:  Yes.

25                 MR. DAVIES:  I think actually it may make

1    the subpoena more important.  I think we had proposed

2    a duces tecum attachment for the governor and/or the

3    custodian of records of the governor's office, which

4    at that time I think were probably one in the same.

5          But you can see that the proposed subpoena

6    asks for a limited set of documentation that is

7    directly relevant to the issues that are set forth in

8    the indictment itself.  And I can go through those

9    item by item and let the Court know what element or

10   what aspect of the indictment I believe that they are

11   relevant to.

12         But again the main purpose of requesting

13   that these subpoenas be issued pretrial is under Rule

14   17(c)(1), which is of course a procedure that the

15   Rules of Criminal Procedure specifically envision,

16   that there are cases in which it is important for

17   counsel for both sides to be able to examine what are

18   probably going to become exhibits before the day of

19   trial.

20         And that's all this motion is asking for.

21   And the reason is -- I think the Court can see that

22   there are a lot of -- there's a lot of analysis that

23   ends up being done of each one of these electronic

24   type of documents in terms of how it relates to the

25   allegations, and we've got four forensic reports and

1    all kinds of things that are done.  So it's not

2    like -- It's not the kind of thing that you can just

3    show up the day of trial and say let me see those

4    documents and then fully integrate them into your

5    theory.

6           So the purpose is asking so that we can be

7    ready so that we're not in a position of asking for

8    time once the trial begins.

9           And the documents requested from the

10    governor's office fall in -- There's a couple of

11    different categories.  There are categories that

12    directly relate to the allegation of -- well, both of

13    improper access, unauthorized access, to a computer

14    and to the identity theft that is alleged in the

15    indictment.

16           For example, paragraphs 1, 2, 3 and 4 --

17    actually 5 -- actually 5, 6 and 7 all go directly to

18    the elements of identity theft.  And we think that

19    those documents that are requested are not only

20    relevant but are evidentiary in nature.

21           Of course, as the Court knows, you can't

22    use Rule 17(c) just to ask for discovery.  Okay.

23    It's not a civil rule where you can ask for

24    everything that may lead to discovery of relevant

25    evidence.  What we have tried to limit the proposed

1    subpoena to is things that we think will be used at

2    trial.

3           And the allegation of course is of

4    unauthorized access.  Most of those requests have to

5    do with authority, how the Yahoo account was set up,

6    who had authority, whose name it was in.

7           We also -- As the Court remembers from the

8    previous motion hearing, there is a major issue in

9    the case regarding whether these, you know,

10   identification documents, meaning the Yahoo address,

11   for example, identifies a specific individual.  And

12   these requests go directly to that issue in terms of

13   who had access, who set it up, things like that --

14   when it was used, and things like that.

15          Paragraph 8 deals directly with the

16   allegation of invasion of privacy.  And as the Court

17   knows, the invasion of privacy issue is one under

18   whatever analysis we end up using, if we go to trial

19   on that count, that is fairly complicated in terms of

20   figuring out what the elements are and what's

21   required and what the expectations of privacy are.

22          And those requests in paragraph 8 deal --

23   They are not an attempt to fish or anything like

24   that.  Unfortunately they come directly from

25   something that's made relevant by the allegation in

1    the indictment.  So I think we have shown that these

2    items are evidentiary in nature, that we don't have

3    any way of getting them without the 17(c) subpoena

4    and that these are the type of documents that the

5    defendant really needs to have some time before trial

6    to be able to analyze them and to be able to use them

7    effectively at trial so that I can provide

8    Mr. Kernell effective assistance of counsel.

9              And I think it's clear that the

10   applications are made in good faith and not intended

11   as a general fishing expedition from the fact that

12   we've tried to narrow them down to the point where

13   we've got.

14             Now, in terms of whether the custodian of

15   records and the governor may now be different, it

16   might be the case that I would seek to issue two

17   subpoenas rather than one.  Frankly, I hadn't really

18   thought about that, but as a practical matter that

19   may be the result.

20             THE COURT:  Number 8.  You want any

21   voluntary disclosures of that private information?

22             MR. DAVIES:  And I don't know how to narrow

23   it down more than that given --

24             THE COURT:  Is it your contention that if

25   somebody voluntarily discloses their cell phone

1  number to a family member, that that opens it up to

2  the world?

3          MR. DAVIES:  No, it's not voluntary

4  disclosure.  I don't think it says to a family

5  member.  It's voluntary disclosure of a family

6  member.  And that's one of the things --

7          THE COURT:  What if you disclosed it to

8  another family member?

9          MR. DAVIES:  Well, I think -- Yeah, and

10  that's not what I meant to seek.  And maybe I should

11  clarify the language there.  What I'm talking about

12  would be voluntary -- See, the indictment says -- I

13  think the indictment says that one of the items was a

14  cell phone number that was disclosed.

15          If there was a voluntary disclosure of that

16  number previously -- And I'm not talking about -- I

17  can make it clear, if necessary.  I'm not talking

18  about giving another family member your cell phone

19  number.  I don't think that reduces your expectation

20  of privacy at all.  I'm talking about voluntary

21  disclosure outside that zone of private family

22  interaction.

23          THE COURT:  What if she voluntarily

24  disclosed it to somebody on her staff?

25          MR. DAVIES:  I think that's -- I guess it

1    depends on the scope of disclosure.  I think that

2    could be relevant to the charge of invasion of

3    privacy that we have.

4              THE COURT:  Is your argument that if she

5    disclosed that to a staff person, like if you

6    disclosed your cell phone to your secretary, then

7    somebody could hack into your computer and get

8    that --

9              MR. DAVIES:  Absolutely --

10             THE COURT:  -- and then it wouldn't be any

11   invasion of privacy because you disclosed it to your

12   secretary?

13             MR. DAVIES:  Absolutely not, but I think

14   that --

15             THE COURT:  Well, what's the relevance

16   then?

17             MR. DAVIES:  The relevance is that the

18   government has alleged an invasion of privacy, a

19   tort.

20             THE COURT:  Right.

21             MR. DAVIES:  And the simple question that

22   I'm trying to get at is whether these items are

23   private.  And so the disclosure outside the normal

24   sphere of family influence I think would be relevant

25   to that.

1          And what I did -- I'm sorry.

2          THE COURT:  Do you mean public disclosure

3     as opposed to voluntary?

4          MR. DAVIES:  I'm not sure exactly how

5     it's --

6          THE COURT:  If the billboard said call Wade

7     Davies at this cell phone number, it would be a

8     little hard to argue that cell phone number was

9     private.

10          MR. DAVIES:  That's right.

11          THE COURT:  But you want every record on

12     her computer that has to do with any voluntary

13     disclosure.

14          MR. DAVIES:  And I think the problem -- the

15     problem is caused by the nebulous nature of being

16     charged in a federal criminal case with invading

17     somebody's privacy.  I think I am required to attempt

18     to rebut every allegation that's made in the

19     indictment, and that's why I narrowed and

20     specifically asked for things that are mentioned in

21     the indictment.

22          THE COURT:  Okay.  What do you say about

23     that, Mr. Weddle?

24          MR. WEDDLE:  I'm not sure how anyone could

25     describe this as a narrowed subpoena request.  Number

1      5, "Any and all documents in your custody" --

2      Remember, this is the governor or her office --

3      "custody, possession, control, which relate, reflect,

4      and/or refer in any manner the manner in which a user

5      may authorize others to access a Yahoo e-mail account

6      and/or setting out the responsibilities of the user

7      for preventing unauthorized access."

8              I mean that's just a whole bunch of

9      documents related to the use of -- whether there's

10     any use of the governor or her office of a Yahoo

11     e-mail account, any Yahoo e-mail account.

12             I only say that to say, Your Honor, that

13     this is a very broad subpoena asking for a lot of

14     documents, which, number one, are not relevant.  But

15     more important, I don't know how they are admissible.

16     I don't think that the subpoena has met the Nixon

17     requirements of relevance, specificity, and

18     admissibility.

19             I mean, Mr. Davies says it's not a fishing

20     expedition.  Mr. Davies has a lot of discovery

21     related to this case, and I don't know how this is

22     not simply fishing for records.

23             THE COURT:  I think he's saying that

24     because you've chosen to charge so many counts, so

25     many different specific things, that you made them

1    relevant.

2           MR. WEDDLE:  Well, again, if Gov. Palin put

3    her daughter's cell phone number on a billboard,

4    yeah, that's no longer -- you're right, that's no

5    longer personal and confidential.  If he wants to ask

6    of any of those occasions, fine.

7           But what he's asking -- what this is asking

8    for is any documents which relate, reflect or refer

9    in any manner to the voluntary disclosure of this

10   stuff.  So that if Gov. Palin wrote a note to her

11   daughter, please, call so and so on my staff, or,

12   please call Janey, my friend, and tell her that I'll

13   be in -- and here's her telephone number and tell her

14   that I'll be in Wisconsin tomorrow, that is subject

15   to this subpoena.  And what does that have to do with

16   anything in this case?

17          THE COURT:  What about the ones to 4chan

18   and Yahoo?

19          MR. WEDDLE:  Well, again, Your Honor, I

20   think that's all duplicative frankly mostly except

21   for --

22          THE COURT:  Well, he just asked for I guess

23   things you're saying you've already given him.

24          MR. WEDDLE:  A lot of, yes, Your Honor,

25   except there are items in here that fall kind of

1    outside of that.  And that is number 9, "Any and all

2    documents to include but not limited to handwritten

3    notes, memoranda, reports, recordings, or other items

4    concerning Yahoo's interactions with law enforcement

5    agents in response to two subpoenas."

6         Number one, how is that relevant?  I

7    suggest it's not.  More importantly, how is it

8    admissible?  Whatever communications Yahoo has with

9    law enforcement in response to subpoenas would seem

10   to me to be hearsay.

11        THE COURT:  Well, other than number 9 on

12   the Yahoo one, do you have any problem with the 4chan

13   one?

14        MR. WEDDLE:  Well, Your Honor, while I'm

15   looking at that, counsel has handed me a note also

16   that defense counsel has not addressed I guess the

17   authority of this Court to issue subpoenas which

18   would be consistent with the Electronic

19   Communications Privacy Act to the extent that these

20   subpoenas call for content of e-mails as well.  I had

21   not even thought of that.

22        But with respect to 4chan -- Well, Your

23   Honor, I don't really know that I have anything to

24   say with respect to that except that I believe that

25   Mr. Davies -- We provided a fair amount of discovery

1   on 4chan.  I don't know that it goes to -- for

2   instance in this case which relate, reflect, refer in

3   any manner to discussion of 4chan and its message

4   boards about Sarah Palin and her use of Yahoo e-mail

5   accounts.

6            I mean there are certainly -- We've

7   provided discovery with respect to the defendant's

8   communications through 4chan, but I guess he's asking

9   for all such discussions in September of 2008.

10           Your Honor, I guess our main point with

11  respect to these -- with the 4chan and Yahoo is that

12  the relevant evidence with respect to those

13  organizations provided in discovery and anything else

14  is irrelevant and inadmissible.

15           I mean I think primarily -- I mean I think

16  the primary concern is with the subpoena to Gov.

17  Palin and her office for these items which don't

18  appear to be relevant.

19           THE COURT:  Okay.  Last word, Mr. Davies.

20  I saw you shaking your head.

21           MR. DAVIES:  No, just that -- I think the

22  government can come up with any example -- any kind

23  of extreme example that could be caused by the

24  wording of one of these requests.  But if there's a

25  problem with the wording, the remedy would be to ask

1      me to draw it more -- draw the request more tightly,

2      because the requests that I've made are directly

3      relevant to the indictment.

4                THE COURT:  All right.  I don't know if

5      it's their obligation.  What you've asked me to do is

6      ask me to authorize the issuance of these subpoenas

7      with this wording.

8                MR. DAVIES:  And if there is a problem with

9      that wording, I guess what I would ask the Court is

10     permission to redraw the request rather than simply

11     to have it denied because it's inartfully stated.

12              THE COURT:  It's not that it's inartful;

13     it's that it may be too artful.

14              MR. WEDDLE:  I was going to suggest that

15     it's very artfully drawn, Your Honor.

16              THE COURT:  Well, one of my concerns in

17     reversing the argument is the breadth of it.  I mean

18     when you want all of September and you want

19     everybody's communications, that's a little broad.

20             MR. DAVIES:  How about instead of inartful

21     how about if I try to do it better?

22             THE COURT:  Narrowed would be better.  All

23     right.  I'll give you until -- What did I tell you a

24     minute ago?

25             MR. DAVIES:  July 27th, Your Honor.

1          THE COURT:  Yeah, July 27th to submit

2     narrowed provisions.  I'm not sure it's good English.

3     We can probably assume from my commentary that the

4     narrower the better.  It's not to say that I would or

5     I wouldn't grant them, but the narrower the better.

6          All right.  Anything else?  Is there any

7     other motions that I've missed or need to take up

8     today?

9          MR. DAVIES:  Can we approach the bench for

10     just a minute?

11          THE COURT:  You and Mr. Weddle?

12          MR. DAVIES:  Yes.

13          THE COURT:  Okay.  We'll go off the record

14     for just a minute.  I don't need all the lawyers, do

15     I?

16          MR. DAVIES:  It doesn't matter to me.  I

17     just want to take up one --

18          THE COURT:  Let's just see what --

19          MR. DAVIES:  Okay.  All right.

20          THE COURT:  If I need them, they can come

21     up.

22          (A conference was held at the bench.)

23          THE COURT:  All right.  Simply for the

24     record, a matter was brought up that was not subject

25     to any of the filings today or any of the motions,

1    and I've simply deferred that until we decide we need

2    to handle anything further on that matter.

3              Anything filed that we need to take up or

4    any other issues that the Court needs to be aware of?

5              MR. DAVIES:  I don't think so, Your Honor.

6              THE COURT:  Anything else, Mr. Weddle?

7              MR. WEDDLE:  No, Your Honor.

8              THE COURT:  All right.  The Court will

9    stand in recess until the afternoon docket begins.

10              THE COURTROOM DEPUTY:  All rise.  This

11    Honorable Court stands in recess.

12              (End of Proceedings.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2     STATE OF TENNESSEE      )

3     COUNTY OF ANDERSON      )

4          I, Lynda L. Clark, Court Reporter and Notary

5     Public, in and for the County of Anderson, State of

6     Tennessee at large, do hereby certify:

7          That I reported stenographically the proceedings

8     held in open court on July 16, 2009, IN THE MATTER OF

9     UNITED STATES OF AMERICA VS. DAVID C. KERNELL; that

10    said proceedings in connection with the hearing were

11    reduced to typewritten form; and that the foregoing

12    transcript is a true and accurate record of said

13    proceedings to the best of my knowledge, skills and

14    ability.

15         I further certify that I am not kin to any of

16    the parties involved therein, nor their counsel, and I

17    have no financial or otherwise interest in the outcome

18    of these proceedings whatsoever.

19         This the 4th day of August, 2009.

20

21                   _____

22                   COURT REPORTER & NOTARY PUBLIC

23                   My Commission Expires:  08/24/11.

24

25

26